Good morning, Your Honors. My name is Peter Haviland. I represent the appellant, Cybersound Records, in this case. I would like to reserve time for rebuttal. You may do so. Just watch the clock. It counts down. Well, thank you. Your Honors, Cybersound is a karaoke company, a competitor of Lead Singer and of the other defendants mentioned in our complaint. And Cybersound is trying to operate as a legal business under the strictures of ABCO and what the music publishers customarily require in its business. And what we have alleged in our complaint is a situation in which Cybersound is confronting defendants who routinely lie to the purchasers of karaoke products, who then supply the major retailers about the nature of their goods, who do not, in fact, pay karaoke synchronization. When you say lie, I assume that's with respect to whether or not a license is needed, or lie in what other respect? We are contending that they represent to those buyers that they, in fact, have all of the requisite licenses that those buyers insist that they have, and that we contend also is required under the copyright laws of the United States. You're also contending that they represent to those same folks that you don't have the required licenses. That's correct, Your Honor. So we have a situation in which we are being confronted by a concerted and organized campaign by the defendants to persuade the purchasers of karaoke products who supply to the retailers that we violate the laws, and therefore, those purchasers should not use our products, and conversely, that the defendants comply with them when they do not, so that they should then be able to take a majority piece of the shelf space. Now, I gather this then reduces itself to really four separate issues. The first one, the Lanham Act claim, and then the copyright infringement claim, the RICO claims, and the State Clause claims. Correct. Which order do you want to proceed with respect to those? Well, let's start with the Lanham Act claims, Your Honor, because CyberSound suffers as a direct competitor, and we are a head-on, we are in head-on competition with these defendants by virtue of the false advertising and promotion that the defendants do with respect to their products. Are the representations that they comply, I see these as two different kinds of representations, that you don't comply and that they do, are the representations that they do comply made only in response to inquiries or in some other way, affirmatively made? Yes, they're affirmatively made as well. How? Well, they are made at sales pitches. They are made, if you look at the allegations in our complaint, they are made on the ---- whether it's commercial advertising or promotion. I don't remember anything in the record that suggests that that was what was being done. Okay. What we have said is that policies were announced by each one of the individual buyers, and those were communicated to each of the defendants, including CyberSound, and that then consistently in the representations, which are not limited simply to signing the Handelman policy or signing the Anderson policy, which is specifically referenced in the record, but also in regular communications with the buyers that these folks are licensed. And one of the distinctions that the ---- How is that, putting aside for a moment the accuracy of the statement, how is that commercial advertising, isn't that a response to an inquiry, isn't it like a legal opinion, if you will? Well, it is a promotion of that product. But you've got specific buyers, Best Buy, West, Walmart, whatever, and they say, we insist that you comply with these things, and they write back and say, yeah, we comply with them. How is that a commercial advertisement? How is that trying to increase their market by asking the general public, for example, to buy something? Well, it's different. It's clearly different from asking the general public to buy something. It's not the same as commercial advertising. Do they hire an ad agency to do this? No. They don't. They just have their lawyers or somebody in-house respond, right? Well, with respect to those particular policies, but the standard in this circuit, I believe, and we've cited the authority in our briefs, is that where the relevant purchasing public is seven or eight buyers, which it is in the karaoke business, and is not the general public, that the issue of whether the representations made or the statements made are made as part of a traditional commercial advertising campaign is not dispositive. The question is, is it a concerted campaign to penetrate the relative purchasing market? And even a single statement could suffice. So from your perspective, it doesn't matter that the representation was requested by the buyer? Well, no. And if you look, for example, at Fashion Boutique, which is the case that is discussed for this proposition, that it is relevant whether this is in response to inquiries or proactive, Fashion Boutique expressly says that they could imagine that in a situation where there was a concerted campaign, every time the name of somebody was brought up to respond with negative or disparaging statements, that that could state a claim under the LAM Act. So in the individual instance where there have been particularized responses to requirements to comply with policies, I'm saying, yes, it is not dispositive that it was a response rather than proactive. And you cite Fashion Boutique for that? Well, not only Fashion Boutique, but Coastal Abstract in the Ninth Circuit. And Coastal Abstract, for example, was a case where there was a single representation made in a limited context, which certainly did not rise to what you would traditionally associate with a broad commercial advertising. Well, why is this an assertion of fact in the first place? Isn't this nothing more than an opinion, maybe even a legal opinion? We've got all of the consents that we need. No problem. Well, because the requirements are more, what's being asked is more specific than that. And what is being asked is provable. Do you have all the licenses that are necessary? Isn't that what you're being asked? No, it's more than that. Well, what is it then? Okay. In the case of the Anderson compliance letter, it says specifically that there must be licenses from 100 percent of the licensors. That is, each individual holder of a copyright must provide a license as evidence of compliance with that policy. Is that different than what I just said, that you have to have all of the licenses necessary? Maybe I'm missing something in the process here. Well, it's different. It's slightly different, Your Honor, because there is an argument under copyright law that if you have co-owners and you have a license from one co-owner, which is a legitimate license, that that might be sufficient to technically comply with authorization for the whole copyright. That's different, however, from saying, as a matter of the customer's policies, that they want proof by virtue of documented evidence that there are signed licenses from each one. And the reason that I ---- As long as the documented evidence is not false, where is the factual representation? I'm still looking for that. If I say that I have licenses from five different publishers, that's a factual representation. If I only have three, if I only have licenses from three, or if I have licenses from none, that's a factual misstatement. And you say you have five. Is that what you're saying? Yes. Okay. All right. We don't have that here, do we? Or do we? Yes. Yes. That's exactly what we have here. We have precisely that there are requests made to prove, A, that you have signed licenses from each of the copyright holders, B ---- By name? Are they specified? Yes. Yes. All right. That there's proof of payment of royalties. Okay. But where is the false statement? Give me an example of something that's in the record that is a false representation. A false representation, for example, is a representation that one of the works, which we have cited in the First Amendment complaint, either as being TVT-assigned works or works for which there are no karaoke licenses permitted at all by the owners of those songs, because it is known within the industry that certain artists do not license certain songs at all, that those songs are used in karaoke use by these defendants, and that they have represented to the buyers that the justification for that use is that they, in fact, have licenses from each of the copyright holders of those songs. That's where it is in the record. So that's the factual misrepresentation, and it's subject to proof. It's not a legal conclusion. It's subject to proof. It sounds like you're trying to litigate a copyright claim but using the Lanham Act. Well, we've talked a good deal about, in Nimmer's example, of the difference between a passing-off claim, which is really a disguised copyright claim, and a separate claim for false or misleading advertising. And they clearly are distinguishable. And the difference is, do you, on the one hand, copy somebody's goods and then represent them to be your own, which would be a kind of passing-off, but Nimmer talks about as really a disguised copyright claim, which is not what we have here, or do you have a situation where you take somebody's work and then represent to somebody else that you have permission to use it or that you have a license to use it? That's a distinguishable difference. And the latter case does support a Lanham Act claim. And that's exactly what we're confronting here. We are confronting a situation where we are being directly damaged as competitors by the representation that a license exists when it does not. That's our plea. But in effect, I don't know whether you were here for the previous argument, but there are some other parties that are contending about the meaning of audiovisual works and so on, an area that at least the parties seem to feel is a matter of some contention. To some degree, part of what you're arguing is that an area that may be, shall I say, in play, in question represents a lie, a form of commercial advertising. Isn't it really more like a legal opinion, what they were talking about, when they responded to Best Buy and these others? Well, this is why I distinguish the two pieces. And, you know, if some of the materials that were included in the excerpts of record that were part of the separate summary judgment motions for separate publisher cases that were severed off from our cases include statements by, for example, Madison to the effect that they believed up until a point in 2004 that this issue of whether you really needed a karaoke synchronization license as opposed to a compulsory license was somehow in dispute. But that because a consensus emerged amongst the publishers and amongst the buyers, that this was a requirement under which people were going to go forward to do business, that they then purportedly stopped selling records based only on compulsory licenses. Can I move you to the second issue here, because you're running out of time? On the copyright issue, isn't what your client got from TVTA divisible right, i.e., a non-exclusive license? No. And the district court was confused on that point. What we have is an assignment simply of what TVTA held. So we are not incorporating... Okay, what did it hold? You stand in their shoes. What did they hold? Okay. They hold one of the songwriters' copyright interest in a song. All of the interest? Or just a divisible interest? Each co-owner has for himself all of the rights to that copyright within his ownership. It does not... So, for example, each co-owner could license on a non-exclusive basis... If what TVTA had was an exclusive right and they assigned you the exclusive right, then you got one situation. On the other hand, if what they had was a non-exclusive right and other people had the right to give other non-exclusive rights, then you really have a standing issue, do you not? I mean, you're not even the owner for purposes of the Copyright Act and being able to prosecute the claim. Well, Your Honor, the distinction between a transfer of a right which encumbers the rights of the other owners versus the transfer of simply the ownership interest of the co-owner himself, which does not encumber the rights of the other co-owners, is a significant difference and is the basis for our standing. And one case that has come up is Davis v. Blige, which we did not cite in the papers. 2007, Westlaw 2893003, Second Circuit case from October 5, 2007. Okay, but I still... I guess I have not heard your answer. Did TVTA have an exclusive right, an exclusive right as opposed to a non-exclusive right with respect to what you were assigned? It had an exclusive ownership interest. Okay, you're using different terminology than I am, so maybe we're trains passing in the night. Let me put it this way. Do other people who have similar rights to what TVTA had have the ability to give an exclusive right to another assignee? The confusion arises over what the meaning of the word exclusive here is. The person who has the exclusive right doesn't have to share... Well, nobody else has the right to do... Well, let me go back. TVTA cannot assign to someone else the right to do what your client has received if it had an exclusive right. If it gave you a non-exclusive right, then it's a different matter. Maybe we can ask the question this way. Where in the record does it show that TVTA had an exclusive karaoke right? We are not contending that it had an exclusive right to exploit the song in karaoke. That's the difference. But don't you have to contend that in order to justify the conclusion that you received an exclusive right? No. Again, let's go back. Let's assume there are just two owners, two co-owners of the copyrighted issue. Each one has an ownership interest, which is a 50% share. Either one of those owners can transfer, can assign whatever that owner holds to somebody else. They can assign no more than what they have. But if they carve it up, as is contemplated by 201D2, don't some of these rights then become licenses and not copyright ownership? No. Realistically, the difference between an exclusive license and an ownership interest is essentially the same. Because the purpose of an exclusive license or an ownership interest is to ensure that there's only one person, there's only one entity. Yeah, but there are plenty of non-exclusive licenses out there, millions. Sure. Now, I guess I come back to my question. Where in this record does it show that you got an exclusive license from TVT? That's the source that you're relying on, right? We plead in the amended complaint, states explicitly in the amended complaint, that TVT holds certain rights as a co-owner of certain songs, that those rights that it had were assigned to Cybersound. The specific right that was assigned was the right to participate, to use, to exploit that interest in karaoke. So if I am Scott Storch, if I am the songwriter, I have a right to sue, to sue for copyright infringement. Okay. Is there a document in the record that establishes that, or are you making a legal argument? A document in the record. The document is the reference to the assignment which was properly recorded with the Copyright Office. And is that in the record? Is the actual assignment document in the record? Yeah, I'm looking for a piece of paper that I can look at and reach a conclusion. Is this an exclusive license, or is it a non-exclusive license, or is it some other greater dignity copyright? Right. No, the assignment agreement that Cybersound has with TVT is not physically in the record. Counsel, your, oh sorry, question? Your contention is that the only place it needs to be is in the complaint, essentially, in this posture. Yeah, for a motion to dismiss, yes. For 12 v. 6, okay. Thank you, Counsel. Your time has expired. We'll now hear from the other side, and would Counsel introduce yourself, and then tell us if you're going to be sharing time with some of the other co-counselors. Yes, Your Honor. My name is Daniel Johnson, and I represent six of the 13 defendants, Audio Stream, Top Tunes, The Singing Machine, Douglas Vogt, Richard Vogt, and Dennis Norton. And the other seven defendants are represented by Counsel at the table, and we have focused on discrete issues. And they do or may want an opportunity to be heard, depending on how this goes, so it is likely that they may be making comments. Well, you have 20 minutes, Max, so use it any way you'd like. Go ahead. Understood. Let's start with this to make it very clear what's going on here in terms of who the defendants are and where their claims are. The copyright infringement claim is not stated against The Singing Machine, nor is it stated against the individuals I represent, The Votes or Mr. Norton. So that's important to keep in mind here. In fact, the individuals are named in one claim only, and that's the RICO claim under 1962C. So in terms of what the court does with this appeal, it should keep in mind that different parties are defendants in different claims. What we have here, generally, is an effort by CyberSound to enforce the rights or the alleged rights of other people. They talked in their presentation about buyers and representations made to buyers. They were trying to enforce copyrights that they don't own. Now, he ended on the discussion of the copyright claim, which I will get to first, but I simply want to point out that what we're looking at here in terms of the universe is the wrong party trying to enforce rights of other people. And it is, frankly, I mean, I don't want to be pejorative, but it's offensive. In other words, this is a standing question. Yes. They have a standing problem on every claim they state. But on the Lanham Act claim, isn't it typical under the Lanham Act for a competitor to be able to complain about false advertising, even though presumably the advertising is directed at customers? Let's put aside for one moment the idea of the elements of a Lanham Act claim and whether responses made to inquiries can qualify as an element under the Lanham Act. I'm willing to put that aside, but your point is that they're enforcing the rights of others, but a right they have under the Lanham Act is the right to complain about a competitor's false advertising. True, except when their attempt to do so would undermine specifically applicable provisions of the Copyright Act. And in this case, the standing provisions of the Copyright Act and the fair use provisions of the Copyright Act. This is the day star argument that we put forward in the audio stream brief. And what we're saying is that as a general proposition, the Lanham Act does give competitors the right to sue each other for false advertising, et cetera, et cetera. But in this circumstance, our position is that what they're doing here is really trying to solve their standing problem under the Copyright Act by enforcing what really amounts to infringement claims that  So what we're saying here is follow what the Supreme Court said in day star, and that is there is a dividing line between Lanham Act on the one hand and copyright on the other. And that dividing line occurs when allowing someone to proceed under the Lanham Act would undermine the Copyright Act. And the wrinkle under their Copyright Act claim, it has two parts, essentially. The rights of others, which you have started to argue about, but also it contends it has its own rights under its assignment from TVT. And that's where actually my argument intended to start. I do want to make one observation, however, on the Lanham Act before I go to the copyright, and that is you heard him say that they allege that defendants told buyers that Cybersound was not licensed. That allegation does not exist as to any of my clients. It is not in the complaint, in any version, original, First Amendment, or state. Now, at the outset, it's worth noting, I think, that there are three fundamental principles of copyright law that combine to defeat all of plaintiff's claims as a matter of law. The first one we talked about a moment ago, and that is under the Copyright Act, only copyright owners and exclusive licensees have standing to assert claims for copyright infringement. That's 17 U.S.C. 501B and the Silvers case out of the Ninth Circuit in 2005. The second thing is that it's undisputed that a jointly owned copyright, that is a copyright where there is more than one author, as a matter of law, cannot be exclusively licensed. It cannot be done. And that's Odo v. Rees, a 1984 Ninth Circuit case, and so the net result of that is that a joint owner of a copyright, someone who owns less than the entire thing, can grant only a non-exclusive license. That's the law. And then finally, the last principle is that a license from one co-owner in a jointly owned copyright situation to use 100% of the copyright insulates the licensee from liability for infringement to the non-licensing co-owners, as a matter of law. So, in other words, if I'm a 10% co-owner of a copyright, I license it to the panel for use. You cannot be sued, or you can be sued, but you can defeat an infringement claim from the 90% owner because you have a license from me. And just following up on what you said a moment ago, I gather that under 501B and the Silvers case that a non-exclusive licensee has no standing to sue for copyright infringement. Correct. Okay. That's correct. And that's the situation that you contend that the plaintiff in this case has. That's right. That's exactly where we are. Well, would you develop that and recall the question I asked opposing counsel? How do we determine what it is that Cybersound got from TVT? Well, I think that the record is how we determine it. And Cybersound's documents that they submitted to this court below, to the district court, establish an admission that what this is is an attempted exclusive license, but failed as a matter of law. Okay. Can you cite me to the record where I can find the documentation that you're referring to? Well, the documentation is there, the pleadings and the evidence. Okay? So in other words, they didn't put in, nowhere in the record is the transactional document from TVT. Well, then are you arguing some sort of estoppel argument then? Well, I'm arguing basically a judicial admission. Okay. Well, then give me the paragraph number where you find that admission. Okay. Let's start with the original complaint. And it's important to understand the original complaint, the evidence they put in, and then follow it up with the first admitted complaint. In paragraph 41G, which is excerpts of record, page 12, they alleged Cybersound is an exclusive karaoke use licensee for a number of musical compositions. All right? So when the first complaint was put on file, they alleged that the ER12, paragraph 41G. Okay. Go ahead, Counsel. All right. So this is how the case started. Then they submitted a declaration from TVT's director of music publishing describing what the transaction was. This is at excerpts of record, page 418. A gentleman by the name of Rel Lafargue. Lafargue. I can't pronounce it. I apologize. My French is really bad. But in paragraph 3 of his declaration, here's what TVT says the transaction was.  Okay. An exclusive license agreement. Again, an attempted exclusive license, which cannot happen in a situation where you have a jointly owned copyright as a matter of law. Finally, and listen to this. Let's keep in mind here that these folks are constrained by Rule 11. Counsel, where in the record does it show that someone else in addition to TVT was an owner of the copyright? They admit that in the pleading as well. Okay. These folks are constrained by Rule 11. So when they allege something, they have to make sure that it's right. And they had to describe the transaction. Okay. When you refer to page 11 of the E.R., you're talking about the original complaint. Yes. All right. And you're going to get eventually to the first amended, right? Because the original complaint is out. It is in a sense. But the first amended complaint makes reference to the transaction described in the first complaint. And what they did is they tried to put the word assignment in there to somehow convey that this was a transfer instead of an exclusive license. All right. But putting that word in there didn't change what the transaction really was, as they admit, in the evidence they submitted to the court and the original complaint. Paragraph 50. First amended complaint. Excerpts of record, page 612. Prior to the commencement of this suit, before the lawsuit was filed, TVT Music Publishing and CyberSound entered into a written assignment agreement, whereby TVT Music Publishing transferred and assigned to CyberSound its ownership interest in the musical compositions listed below, per en, in each case for these songs, an interest which is less than 100 percent of the copyrighted interest in these compositions. Okay. So right there, they admit that all the compositions at issue are jointly owned and that they don't even purport to own all of any of them. So since we review this de novo, it is, as a matter of law, your contention that since there are other owners, they cannot possibly convey an exclusive license. That's right. And therefore have no standing on the copyright issue. That's correct. And keep in mind that they put in the record the description of what the transaction was, an exclusive license from TVT. And here's what they say in their First Amendment complaint later in paragraph 50. Pursuant to that agreement, CyberSound became exclusive assignee and licensee of TVT Music Publishing's copyrighted interest for purposes of karaoke use. Well, exclusive licensee. They are describing the transaction that they based their original suit on. They put in the evidence as to what it was, an exclusive license. And then even in their First Amendment complaint, although they put the word assignment on there, they couldn't not describe the transaction to be what it really was. And that was an attempted exclusive license that fails as a matter of law. So that right there defeats their claim. And, of course, there is another reason that their claim is defeated on the Copyright Act. And that is, in order for them to state a claim for copyright infringement, they had to allege that they were either the owner or exclusive licensee of a copyrighted ad issue. We've dealt with that. And then they had to allege that the defendants infringed on the copyrights by using them without any license. The problem with what they alleged is they allege that we use these copyrights without a license from TVT or Cyber Center. They don't allege that we engaged in any unlicensed use at all. And, again, constrained by Rule 11, they were not about to allege that our use was unlicensed. The gravamen of their copyright infringement case is that we use, meaning the defendants, the nine compositions at issue, quote, without obtaining licenses reflecting 100 percent of the copyrighted interests in these songs, close quote. That is paragraph 52, excerpts of record, page 613 and 614. Now, Cyber Sound is saying, well, the district court should have examined the licenses with respect to the nine compositions and determined whether they were breached. But this ignores the fact that a license given for a copyright is valid unless and until it's terminated by the copyright holder. That's the Peer v. Paosa case, 909, Fed 2nd, 1332. And also that a non-licensing joint owner lacks standing to contest the licenses issued by a licensing joint owner. And that's the Hustlers Inc. case v. Thomason out of the Northern District of Georgia. If you're right on the copyright claim, then what does that, in your view, do to the RICO claim? Well, it decimates the RICO claim because everything else that they've alleged is an injury, a primary injury to a third party. Actually, it's not even a primary injury to them. It's a tertiary injury because what they're saying is that we inflicted harm on copyright owners who have their own rights and, in fact, have sued for alleged infringement. And they allege that there's problems with buyers. Well, buyers have the right to enforce if they think that we've made misrepresentations to them. So those people are going to assert their claims if they have them. And so if they don't have a copyright claim existing, they have absolutely no colorable argument whatsoever that the RICO claim stands. And keep in mind here, and this is why I started out this way, that some of the defendants are not named in the copyright infringement claim. So that's important because if the copyright infringement claim were to survive and give some sort of basis for RICO standing, which we don't think it should, these people who are not named as defendants, they should be dismissed from the RICO claims as well. Your Honors, I'm down to 3 minutes and 45 seconds. I don't know if any of my other colleagues wanted to say something. Can I just ask you one thing? Are your clients named on the state law claims? Yes, my institutional clients, my entity clients, not the individuals. They're only named at one point in 1962. May it please the Court. Paul Sorrell, and I represent the Defendant Madison Entertainment LP and its principals, Amos Alter and David Alter. And I would like to just briefly address the RICO claim. And the case that we cited in the brief that is directly on point is the Perfect Ten case, Perfect Ten v. C.C. Bill. It was a decision from the Central District Court of Appeal. I'm familiar with that case. Yes. And there was, in that case, there were, as in, as here, there were claims based on alleged copyright infringements of the plaintiff and copyright infringements of copyrights allegedly owned by third parties. There were claims in that. Are we talking about 1962C? There were claims in that case under both. There were claims under 1962A, wrongful use or investment of proceeds. There were claims in that case under 1962C. Judge Baird, in that case, applied the three-part test to both claims and found that with regard to the claims based on infringement of the plaintiff's copyrights, there was no basis for a claim because the copyright infringement, the plaintiff had no basis for a copyright infringement claim in that case, as this plaintiff doesn't for the reasons that have been discussed. And the court used the three-part test to determine whether the competitive injury that was claimed in that case was by reason of the wrongful conduct under 18 U.S.C. 1964 and the three-part test identified in Mendoza that's in effect in this district. Now, does ANZA play into this issue? ANZA plays into this issue insofar as it, in that case, the court below had not conducted the proximate cause analysis with regard to the 1962A claim. What ANZA said was you have to conduct a proximate cause analysis and sent the claim back. What was important about that case, about ANZA, is that the court noted that the proximate cause requirement was required under the Holmes case. The Holmes case was a 1962C case. And there's no suggestion in ANZA that any different test should be applied. There's no reason for any test to be applied. The statute, there's only one statute that addresses standing for a RICO claim, and that is 18 U.S.C. section 1964. That talks about the damage being by reason of the defendant's conduct. There is no suggestion in that statute. There's no suggestion in Mendoza or ANZA or any other case that a different test should apply to a claim under subsection A or subsection C. This court has developed a very useful, clear, three-part test in Mendoza, and there has not been any suggestion by the plaintiff as to why the court, as to why that analysis would be any different. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision, and the Court will adjourn. Excuse me, Your Honor. Excuse me. I thought I had a minute and a half. You were negative. Negative. No, no. You had overstated your time. I indicated that you had consumed all your time, counsel. Thank you. All rise. Security, security. All those having had business before this order go forward. The Ninth Circuit Court of Appeals, and I'll be part of this court, stands adjourned.
judges: O'scannlain, Smith, Mosman